UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ALICIA VILLEGAS, et al.,

    Plaintiffs,

v.                                                                                          Case No.  1:07-CV-331

DAVID COATS, &
SPIRIT-MILLER TRUCKING LLC,

    Defendants.

_____/

## OPINION

### INTRODUCTION

Michigan Plaintiffs Ana, Raquel, Lizzette, and Alicia Villegas (collectively referred to as "Plaintiffs") allege that Missouri Defendant David Coats (Coats), while driving a semi tractor-trailer owned by Missouri Defendant Spirit-Miller Trucking LLC (Spirit-Miller), injured them in Ohio by negligently forcing their vehicle off the Ohio Turnpike and into a median barrier.  Defendants move for summary judgment.  Plaintiffs also move for summary judgment.  At a hearing on the cross motions, the Court held that Michigan law applies, that the Michigan no-fault act's threshold applies to Plaintiffs' recovery of noneconomic damages, and that Raquel and Lizzette Villegas are not entitled to noneconomic damages because they do not meet that threshold.  This Opinion addresses the remaining issues raised by the parties' motions, specifically whether any of the Plaintiffs is entitled to economic damages and whether Ana and Alicia Villegas are entitled to noneconomic damages.

**FACTS**

Plaintiffs are Michigan citizens. (Compl. ¶ 1.)[1] Coats is a Missouri citizen. (*Id.* ¶ 2.) Spirit-Miller is a limited liability company whose members are all Missouri citizens. (Def.'s Am. Notice of Removal 2.)[2] Plaintiffs are suing Defendants in a Michigan venue to recover damages for injuries they received in Ohio on June 12, 2004, when Coats ran Plaintiffs' car off of the Ohio Turnpike. (Compl. ¶ 5.)

On June 12, 2004, Coats, who had an independent-contractor agreement with Spirit-Miller, was driving a semi tractor-trailer owned by Spirit-Miller.[3] He was delivering the tractor-trailer from its point of manufacture to the point of sale. While in Ohio on Interstate 80, he changed lanes into the lane of travel occupied by Plaintiffs' car. To avoid Coats's vehicle, Plaintiffs swerved and collided with the median barrier. Defendants admit that Coats was negligent. (Alicia Villegas's Dep. 3–4.)

Plaintiffs allege that they suffered injuries caused by the accident, and each of them alleges ongoing pain and physical complications. Their injuries are discussed in detail in the Analysis section of this Opinion.

**ANALYSIS**

Summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) (citing FED. R. CIV. P. 56(c)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the

---

[1] docket # 1-2.
[2] docket # 8.
[3] The facts in this paragraph are provided by way of background. The information is taken from Defendants' brief in support of their motion for summary judgment. Some but not all of the facts are in the depositions and affidavits.

Court views the evidence and draws all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When the Court considers cross motions for summary judgment, it must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party. *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 506 (6th Cir. 2003).

Michigan's no-fault act, which governs this case, embodies a compromise. MICH. COMP. LAWS §§ 500.3101–.3179 (LEXIS through 2008 P.A. 42); *Kreiner v. Fischer*, 683 N.W.2d 611, 616 (Mich. 2004). For motor-vehicle-accident cases covered by the act, Michigan's legislature abolished tort liability and replaced it with a scheme that provides compensation from a person's own insurance company. In exchange for the payment of no-fault benefits from one's own insurance company, "the Legislature limited an injured person's ability to sue a negligent operator or owner of a motor vehicle for bodily injuries." *Kreiner*, 683 N.W.2d at 616.

The application of that compromise to specific cases is sometimes difficult. In particular, it is still unclear exactly how the act's abolition of tort liability applies to out-of-state accidents. One point of contention has been whether the act abolishes tort liability for economic losses arising from an out-of-state accident. *See McLean v. Wolverine Moving & Storage Co.*, 468 N.W.2d 230, 232 (Mich. Ct. App. 1991) (holding that the no-fault act did not "abolish tort liability for economic loss arising from an out-of-state accident"). Another point of contention has been whether the act's threshold requirement for tort recovery of noneconomic damages applies to actions where tort liability arises from an out-of-state accident. *See id.* (identifying what the Michigan Court of Appeals believed to be the proper reading of the no-fault act and reluctantly abandoning that reading to follow contrary Michigan Supreme Court precedent holding that the act's noneconomic-damages threshold applies to claims arising from out-of-state accidents).

This case presents issues regarding both of those points of contention.

*Economic Damages*

Plaintiffs argue that they are entitled to economic damages because this accident occurred out of state. In support of their argument, they cite section 500.3116(2) of the Michigan Compiled Laws, which provides that an insurer is entitled to reimbursement for personal protection insurance benefits paid or payable to an insured "if recovery is realized [by the insured] upon a tort claim arising from an *accident occurring outside this state*." MICH. COMP. LAWS § 500.3116(2) (emphasis added). They argue that this language implies that the no-fault act did not abolish tort liability for economic damages in out-of-state-accident cases. Defendants argue that Plaintiffs are not entitled to economic damages even though the accident occurred out of state. They argue that a contrary holding would permit plaintiffs in cases like this one to "double dip" in contravention of the clear policy and language of the no-fault act. They contend that because Plaintiffs are Michigan residents insured by a Michigan insurer, and because Plaintiffs' insurer has already paid their economic losses in full, Plaintiffs cannot recover what would be duplicative economic damages.

Defendants are correct that the no-fault act provides a mechanism that permits an insurer to prevent Plaintiffs from double dipping. They are incorrect, however, in asserting that the mechanism is self executing. The statutory language does not support that argument, and neither does Michigan caselaw. *See McLean v. Wolverine Moving & Storage Co.*, 468 N.W.2d 230, 232 (Mich. Ct. App. 1991) (citing *Workman v. Detroit Auto. Inter-Ins. Exch.*, 274 N.W.2d 373, 386-87 (Mich. 1979)); *Allstate Ins. Co. v. Jewell*, 452 N.W.2d 896, 899 (Mich. Ct. App. 1990) (holding that an insured injured in a car accident outside of Michigan was entitled to bring a tort action under Michigan law to recover economic damages, and that the insurer was entitled to reimbursement from

4

any award for economic loss up to the amount the insured had received or was entitled to receive in personal protection insurance benefits).

The holdings in the Michigan cases follow from a straightforward reading of the act, which abolishes tort liability only if the "tort liability" arises out of the ownership or maintenance of a Michigan-insured vehicle anywhere, or from "use within the state" of a Michigan-insured vehicle. In this case the accident does involve a Michigan-insured vehicle, but the alleged "tort liability" does not arise out of the ownership or maintenance of that vehicle. Rather the alleged tort liability arises out of a Missouri operator's use of a Missouri vehicle in Ohio. Accordingly, the no-fault act does not abolish tort liability for the claim, and economic damages may be recovered as normally provided for and limited by Michigan law. *See, e.g.*, *Nasser v. Auto Club Ins. Ass'n*, 457 N.W.2d 637, 649–51 (Mich. 1990).

This does not mean that Plaintiffs will be allowed to double dip. To prevent double recovery, Plaintiff's insurance provider may choose to assert its statutory right to reimbursement from any recovery. *See Auto-Owners Ins. Co. v. Employers Ins. of Wausau*, 303 N.W.2d 867, 869 (Mich. Ct. App. 1981) ("[An] insurance carrier paying personal injury protection benefits is entitled to reimbursement from the tort recovery of a person injured as a result of a motor vehicle accident only if, and to the extent that, the tort recovery includes damages for losses for which personal injury protection benefits were paid." (quoting *Workman v. Detroit Auto. Inter-Ins. Exch.*, 274 N.W.2d 373, 386 (Mich. 1979)). This, too, arises from a straightforward reading of the statute. The right to reimbursement is between the insured plaintiffs and their carrier, and is not directly enforceable by the tortfeasor or its carrier.

In ruling for Plaintiffs on this, the Court does not accept Plaintiffs' theory that the no-fault act preserves traditional tort liability in all out-of-state-accident cases. That is not what the statute

says. Section 500.3135(3) abolishes tort liability that arises out of the "ownership, maintenance, or use within this state" of a Michgan-insured vehicle. The Court believes that the phrase "within this state" modifies only "use." This is the most grammatically proper interpretation and best expresses the discernible intent of the legislature. "Ownership," "maintenance," and "use" are separated by commas, and only "use" is modified. The legislature could have abolished tort liability arising from "ownership within this state, maintenance within this state, or use within this state" of a Michigan-insured vehicle. Alternatively, if it wanted to abolish tort liability only in in-state accidents it could have simply used the phrase "accident occurring inside this state." In fact, the legislature used such specificity in section 500.3116(2).[4] Yet it chose not to use such specificity in section 500.3135(3). The difference must mean something. Accordingly, section 500.3135(3) must abolish tort liability under Michigan law in actions arising out of the ownership *in any state*, maintenance *in any state*, or use *within Michigan* of a Michigan-insured vehicle. In this case, the issue is largely academic because the tort liability at issue arises from a Missouri operator's negligent use in Ohio of a Missouri owned, maintained, and insured vehicle. The asserted tort liability does not proximately arise out of the ownership, maintenance, or use—in or out of Michigan—of a Michigan-insured vehicle at all. Accordingly, the Court holds that Plaintiffs may recover economic damages proximately caused by Coats's negligence, but not simply because this accident occurred out of state.

### *Noneconomic Damages*

Any recovery by Plaintiffs of nonecomomic damages is still subject to the threshold limitation of section 500.3135(1). That section provides that "[a] person remains subject to tort

---

[4] That section provides that "subtraction from or reimbursement for personal protection insurance benefits paid or payable under this chapter shall be made only if recovery is realized upon a tort claim arising from an *accident occurring outside this state*." MICH. COMP. LAWS § 500.3116(2) (emphasis added).

liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." MICH. COMP. LAWS § 500.3135(1). Thus Plaintiffs, who did not suffer death or permanent serious disfigurement, may recover noneconomic damages only if they suffered a serious impairment of body function. The Court holds, for reasons more fully described during the hearing on the parties' cross motions for summary judgment, that this limitation on noneconomic damages exists as an independent statutory bar even in tort claims that are not abolished by section 500.3135(3). A straightforward reading of the statutory language requires this result, and controlling Michigan caselaw so holds. *McLean v. Wolverine Moving & Storage Co.*, 468 N.W.2d 230, 232 (Mich. Ct. App. 1991) (citing *Auto Club Ins. Ass'n. v. Hill*, 430 N.W.2d 636 (Mich. 1988)). The issue, then, is whether Plaintiffs suffered a serious impairment of body function.

A serious impairment of body function is "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." § 500.3135(7). To determine whether an impairment falls within that statutory definition, courts engage in a four-part analysis: (1) there must either be no factual dispute or only an immaterial factual dispute regarding the alleged impairment; (2) an "important body function" must have been impaired; (3) the impairment must be "objectively manifested," rather than merely subjectively complained of; and (4) the impairment must affect the person's "general ability to lead his or her normal life." *Kreiner v. Fischer*, 683 N.W.2d 611, 625–26 (Mich. 2004).

A person is "generally able" to lead her normal life if she is "for the most part" able to lead her normal life. *Id.* at 624. An impairment affects a person's ability to "lead" her normal life when it affects the "course" of her life. *Id.* "Accordingly, the effect of the impairment on the course of a plaintiff's entire normal life must be considered. Although some aspects of a plaintiff's normal

7

life may be interrupted by the impairment, if, despite those impingements, the course or trajectory of the person's normal life has not been affected," then the person has not suffered a "serious impairment of body function." *Id.* at 625.

The Michigan Supreme Court has set forth a nonexhaustive list of factors that courts should consider when determining whether a person's general ability to lead his or her normal life has been affected:

> the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment, (d) the extent of any residual impairment, and (e) the prognosis for eventual recovery. This list of factors is not meant to be exclusive nor are any of the individual factors meant to be dispositive by themselves. . . . [T]he totality of the circumstances must be considered . . . .

*Id.* at 626.

Plaintiffs concede that neither Raquel nor Lizzette Villegas suffered a "serious impairment of body function" as defined under Michigan law, and the Court has already held that neither of them is entitled to noneconomic damages. Thus this Opinion considers only whether the evidence in the record would allow a reasonable juror to find that Ana or Alicia Villegas, or both, suffered a "serious impairment of body function."

### *Alicia Villegas*

Defendants challenge the third and fourth elements that the Court must consider in determining whether Alicia Villegas has met the serious-impairment-of-body-function threshold. Thus the two issues are (1) whether Alicia Villegas suffered an objectively manifested impairment, and (2) whether that impairment has affected her general ability to lead her normal life.

### *Objectively Manifested Impairment*

The Michigan Supreme Court has clearly held that mere "[s]ubjective complaints that are not medically documented are insufficient" to establish an objectively manifested impairment.

8

*Kreiner*, 683 N.W.2d at 625. Unfortunately, it has not given any clear indication of what is sufficient. The Michigan Court of Appeals, in attempting to provide clarification, has held that because "[m]edically unsubstantiated pain will always be present in a tort action for pain and suffering," an "objectively manifested" injury must be "capable of objective verification by a qualified medical person either because the injury is visually apparent or because it is capable of detection through the use of medical testing." *Netter v. Bowman*, 725 N.W.2d 353, 358, 362 (Mich. Ct. App. 2006).

There is little in the record on this issue, but there is sufficient evidence to establish that Alicia Villegas suffered an objectively manifested impairment. Alicia's impairment is not visually apparent, but there are at least two pieces of evidence in the record that, when taken together, show an impairment "capable of detection through the use of medical testing:" (1) a consultation report indicates that an electrocardiogram showed a possible myocardial contusion, and (2) an emergency room report indicates that Alicia's post-accident electrocardiogram was abnormal. (Robinson Memorial Hospital Consultation Report (June 13, 2004);[5] Robinson Memorial Hospital Emergency Room Report (June 12, 2004).[6]) There is also an emergency room report observing that "[p]alpation of the midline chest does cause some chest discomfort." (Robinson Memorial Hospital Emergency Room Report (June 12, 2004).)[7]

Accordingly, a reasonable fact finder could conclude that Alicia established an objectively manifested impairment. The issue thus comes down to whether the fact finder could also conclude under Michigan law that the impairment affected Alicia's general ability to lead her normal life.

---

[5] docket # 78-2.
[6] docket # 74-7.
[7] docket # 78-2.

### *General Ability to Lead a Normal Life*

Before the accident, Alicia worked as a service representative for the Social Security Administration. (Alicia Villegas's Dep. 14–15.)[8] She had a desk job. (*Id.* at 16, 18.) She processed social security cards, address changes, direct deposits, and other miscellaneous business. (*Id.* at 15.) She was also the pastor at Missionary Church of Christ where she handled the day-to-day operations of the church, including conducting mass every Tuesday, Thursday, Friday, and Sunday. (*Id.* at 22–23, 26.) She had a copastor who helped her with her responsibilities. (*Id.* at 23.) Her hobbies and recreation activities were reading and walking. (*Id.* at 38.)

Since the accident, Alicia still works as a service representative for the Social Security Administration. (*Id.* at 15.) She says she now suffers pain that she rates as an eight on a scale of one to ten, and she has to regularly take over-the-counter medication for her pain. (*Id.* at 36–37.) But she is still able to do everything she did before the accident. She is still able to perform all of her job duties. (*Id.* at 15–16.) She was given a special chair to accommodate her back pain, but she still works forty-hour weeks and she even works overtime when it is available. (*Id.* at 16, 41–42.) She is still the pastor of her church, where with the help of others she still handles the day-to-day operations. (*Id.* at 24, 26.) She is also still able to care for herself and her daughters who live with her. (*Id.* at 31–33.) She is even able to care for foster children. (*Id.* at 44–46.) She is still able to read and walk, though she says that her ability to walk has changed. (*Id.* at 38–39, 44.) She is no longer able to take long walks or walk up stairs without getting out of breath. (*Id.* at 44.)

Under governing Michigan law, this evidence is insufficient to meet the threshold requirement. While some aspects of her normal life have been impinged by her impairment, "the course or trajectory of [her] normal life has not been affected." *Kreiner*, 683 N.W.2d at 625.

---

[8] docket # 74-1.

"Considered against the backdrop of [her] preimpairement life," Alicia's postimpairment life "is not so different that [her] 'general ability' to lead [her] normal life has been affected." *Id.* at 627. She is still able to perform all the work that she did before, and she is not prevented from doing any of her hobbies or preferred recreational activities. Looking at her life as a whole—considering the totality of the circumstances—both before and after the accident she has the same course of life. It is not enough that she has some limitation or some discomfort while at work or while walking. *See id.* at 628 (holding that plaintiff, who was a carpenter, did not satisfy the serious-impairment-of-body-function threshold even though he could no longer stand on a ladder for more than twenty minutes, had to limit his workday from eight to six hours, had difficulty walking more than half a mile without resting, and could no longer hunt rabbits). Alicia's injury was not extensive, she missed only two weeks of work while recovering, and the effect of any injury on her "body function was not pervasive." *Id.* at 627.

### *Ana Villegas*

Defendants challenge only the fourth element that the Court must consider in determining whether Ana Villegas has met the serious-impairment-of-body-function threshold. Thus the only issue is whether Ana suffered an impairment that has affected her general ability to lead her normal life.

Before the accident, Ana was unemployed. (Ana Villegas's Dep. 7–8.)[9] Her hobbies and recreational activities were limited to reading and walking. (*Id.* at 27.) She also had responsibilities around the house, including tidying up, cleaning, cooking, and doing dishes. (*Id.* at 29.) Since the accident, Ana has held a number of jobs and currently works as a teacher's aid for Grand Rapids Public Schools. (*Id.* at 8–9, 13.) Her responsibilities include making sure the eight two-to-five-

---

[9] docket # 74-5.

year-old children in her classroom are safe, have snacks, and have clean diapers. (*Id.* at 16.) She is limited in her ability to lift heavy objects, including the children in her class, and she suffers from lower back pain. (*Id.* at 26–27.) Her job demands that she devote a significant amount of attention to the children, but she avoids carrying them because of her back pain. (*Id.* at 16, 19.) Despite her back pain and limitations, however, she requires no accommodations at work. (*Id.* at 19.) She still reads but because of her back pain does not take walks anymore. (*Id.* at 28–30.) She still performs the same household responsibilities, though she does them more slowly and has to take occasional breaks because of her pain. (*Id.* at 29.) She also cares for a three-year-old child. (*Id.* at 31–33.)

This evidence is also insufficient under Michigan law to meet the threshold requirement. Ana's pain does not prevent her from working. She has not needed any special accommodation at work. Her pain does not prevent her from doing household chores. And her pain does not prevent her from engaging in her preferred recreational activity, walking, though she says she no longer likes to take walks because long walks hurt her back. Still, unlike in the case cited by Plaintiffs, comparing Ana's life before and after the accident is not "similar to comparing day to night."[10] *McDanield v. Hemker*, 707 N.W.2d 211, 219 (Mich. Ct. App. 2005). Ana's life after the accident is not significantly different from her life before the accident. She is still able to perform all the work that she did before. In fact she does more now than she did before, and she is not completely unable to do any of her hobbies or preferred recreational activities. Looking at her life as a whole—considering the totality of the circumstances—both before and after the accident she has

---

[10] The Plaintiff in *McDanield* was injured in a motor-vehicle accident. *McDanield*, 707 N.W.2d at 214. She suffered neck, back, and shoulder injuries. *Id.* She was out of work for approximately seven months; when she returned to work she needed assistance from coworkers because of her pain; she could no longer do all of her household chores or gardening; her injury interfered with her sleep habits and intimacy with her husband; she no longer went camping; she no longer played volleyball; she no longer went bowling; she no longer rode her bicycle; she no longer played baseball; she no longer played basketball; and she was destined to a life of continual medical treatment. *Id.* at 218–19. The Michigan Court of Appeals held that considering those circumstances the plaintiff had met the serious-impairment-of-body function threshold. *Id.* at 221–22.

the same course of life.  It is not enough that she has some limitation or discomfort while at work, doing chores, or while walking.  Even though she may not be able to work or partake in recreational activities to her "full capacity, [she] is generally able to lead [her] normal life.  A negative effect on a particular aspect of an injured person's life is not sufficient in itself to meet the tort threshold." *Kreiner*, 683 N.W.2d at 628.  Ana's injury, though more severe than Alicia's, was not extensive.  She has been released from her primary physician's care, she has not needed surgery, and the effect of any injury on her "body function was not pervasive."  *Id.* at 627.

Alicia and Ana's cases illustrate the difficulty that the Michigan no-fault compromise as interpreted by *Kreiner* can engender.  The overall legislative compromise—relatively certain and litigation-free economic reimbursement in exchange for a ban on noneconomic recovery in all but "serious impairment" cases, and presumably lower insurance rates that reflect this—is readily understandable in the abstract.  But in specific cases, that can sometimes leave people with real injury and real loss "compensated" only by the general and hard-to-measure compromise.  No one suggests that Alicia and Ana are unaffected by the accident.  The only claim and holding here is that the evidence does not support a finding that Alicia and Ana were affected to the life-changing extent necessary to permit a claim for direct compensation of noneconomic injury above the statutory threshold.

## CONCLUSION

Because Plaintiffs' injuries do not meet the serious-impairment-of-body-function threshold, Defendants' motion for summary judgment (docket # 73) is granted with respect to noneconomic damages.  Because the alleged tort liability in this case arose out of a Missouri defendant's negligent use outside of Michigan of a non-Michigan-insured vehicle, Defendants' motion is denied with respect to economic damages, and Plaintiffs' motion for summary judgment on the availability of

economic damages (docket # 75) is granted.  The amount of Plaintiff's economic damage recovery is subject to all applicable Michigan law.


Dated:     April 15, 2008            /s/ Robert J. Jonker
                                    ROBERT J. JONKER
                                    UNITED STATES DISTRICT JUDGE